IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2005 Session

**IN RE:  D.A.J.**

**Appeal from the Juvenile Court for Montgomery County**
**No. 58-133     L. Raymond Grimes, Judge**

_____

**No. M2004-02421-COA-R3-JV - Filed December 9, 2005**

_____

Romina Jessica Clifton ("Mother") and Dwight Cain Jemison ("Father") are the parents of a six year old daughter.  In 2004, Father filed a petition to modify custody of the child by seeking to be designated the child's primary residential parent.  Following a hearing, the Juvenile Court concluded that there had been a material change in circumstances and that it was in the child's best interest to designate Father the primary residential parent.  The Juvenile Court also set forth Mother's co-parenting schedule as well as her monthly child support payments.  Mother appeals challenging the propriety of the Juvenile Court's  decision to designate Father the primary residential parent as well as the amount of her child support.  We affirm the designation of Father as the primary residential parent but modify the amount of Mother's monthly child support.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Juvenile Court Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Thomas R. Meeks and Gregory D. Smith, Clarksville, Tennessee, for the Appellant Romina Jessica Clifton.

Stacy Turner Olson, Clarksville, Tennessee, for the Appellee Dwight Cain Jemison.

## OPINION

## Background

This is a custody and child support dispute between Mother and Father which involves their six year old daughter who was born out of wedlock in September of 1999. After the child was born, Mother was the primary residential parent inasmuch as there was no order of custody to the contrary.[1] In March of 2004, Father petitioned the Juvenile Court seeking to be designated the child's primary residential parent. A hearing on Father's petition was conducted in August of 2004, with Father being the first witness. Father testified that he recently became certified in refrigeration and is looking for employment in that field. Father is a veteran of the armed forces and his VA counselor currently is assisting him in finding employment. Father obtained the certification from Tennessee Technical College and intends on continuing his education at that institution.

After the parties' daughter was born, Father and Mother shared time with their daughter even though no formal parenting plan existed. Father maintained a calendar on which he kept track of when he exercised co-parenting time with the child. Father claimed he was caring for the child more than fifty percent of the time, at least until he filed the petition seeking to be designated the primary residential parent, at which time "everything changed." Father is a single parent and has custody of another daughter who is twelve years old. Father's older daughter has a good relationship with the younger daughter. Father was ordered to pay child support in 2003 and is current on those payments. According to Father, for at least the past year Mother sent the parties' daughter to daycare even though Mother was unemployed and, therefore, at home.

Father described an incident where Mother became upset and told Father she was coming to get the child. Mother became violent when she arrived and caused a scene to the point where Father called the police. Father stated that Mother even threatened his fiancee, Debra McClure. Father's opinion is that it would be in the child's best interest for him to be the primary residential parent. Father stated that he and the child do a lot of "educational things" such as going to the library, etc., which would be better than the child simply "sitting at a day care … she needs to do something other than being at day care." Father explained that the parties' child has asthma which is exacerbated from being around Mother, who smokes. Father and Mother exchange physical custody of their child at a store. As Father does not pick up or drop off the child at Mother's house he cannot state whether Mother smokes inside of her house when the child is present. However, Father has seen Mother smoking in her car when they were exchanging physical custody of the child. Father described another incident where the child had been in the care of one of Mother's friends for three days, Mother had not told Father where the child was, and Mother's whereabout were unknown to Father.

---

[1] Tenn. Code Ann. § 36-2-303 provides that "[a]bsent an order of custody to the contrary, custody of a child born out of wedlock is with the mother."

On cross-examination, Father stated that his current income is derived primarily from VA disability benefits. Father became disabled after being injured in Saudi Arabia years ago. Father intends on finding employment in the refrigeration field which will allow him to have a flexible schedule so he can take care of his children properly. Father added that he can do work as an independent contractor if necessary because he already owns the tools required to perform refrigeration work. Father currently lives with his fiancee and there are a total of four children living in the house, two boys and two girls, ranging from eight to fourteen years of age. Father's fiancee, Debra McClure ("McClure"), is a manager at Convergy's and typically works from 7:45 a.m. to 4:45 p.m.

McClure was called as a witness on Father's behalf. McClure acknowledged that she is living with Father and that they are engaged to be married. McClure verified the accuracy of Father's calendar showing when Father exercised co-parenting time with the parties' daughter. McClure testified that she has three children, all of whom consider Mother's and Fathers's daughter a sibling. The parties' daughter attends all of the McClure's family functions. McClure testified that Father is very active with both of his children and is an excellent father. McClure is aware of Mother working a total of five to seven weeks in the past two years.

The final witness was Mother. Mother testified that she currently is not employed because she recently had another child and has not been released by her doctor to return to work. With regard to Mother's work history, she stated that she worked for Frigidaire on two different occasions. Her most recent employment at Frigidaire was in November of 2003, but her pregnancy caused her to miss too much work and she described this employment as "brief". Prior to her most recent employment at Frigidaire, Mother worked three or four months as a nursing assistant. Prior to the nursing assistant job, Mother worked at Frigidaire for four and one-half years.

Mother acknowledged that she sent the child to day care even when she was not working. Mother claimed she did this because her daughter benefitted from being in day care as opposed to sitting at home with Mother. While Mother admitted she smoked cigarettes, she denied smoking in her house or around the child.

According to Mother, she got into a "fight" at a night club called the Dynamic 6. As a result of this fight, Mother was taken to the emergency room and eventually pressed charges against the other person in the fight. Mother admitted there was another incident where she again claims to have been assaulted. Mother denied that the parties' child was present during either of the assaults. Mother also admitted that McClure has called the police when she and McClure got into "altercations."

On cross-examination, Mother acknowledged that she lives in government assisted housing and when she is not working she does not have to pay any rent. Mother stated it has been "quite some time" since she has had to pay rent. Although Mother claimed that she could not work during her most recent pregnancy, she was well enough to go to Virginia for a week to visit with the father of her latest child. Mother's only employment in the past three years was the "brief" time she

worked at Frigidaire and the nursing assistant job. However, Mother had the parties' child attending daycare throughout these three years. Mother's current income consists of government assistance and the child support she receives from Father.

Mother was questioned about a police report that was made when someone allegedly tried to back over Mother with a truck. Mother reviewed the report and even though she acknowledged "something happened because my name is on this police report, … I do not remember this incident at all." Mother went on to describe an incident which occurred in November of 2003, at which time she claims to have been the victim of a domestic assault. Mother allegedly was assaulted by her own sister and her (i.e. Mother's) boyfriend. Although this alleged assault happened in Mother's apartment at 2:15 a.m., Mother nevertheless claimed the child was with a babysitter.

Following the hearing, the Juvenile Court announced its decision from the bench. According to the Juvenile Court:

> The proof before the Court is that during the last thirteen months the child was with the father for a greater period than the mother. In fact, … the father has had the child significantly more days than the mother.
>
> The evidence is that the mother lives in subsidized housing with no rent having been paid, that she doesn't work or perhaps works sparingly. That she's … been involved with several altercations of violence. At least two fights. One time … someone was trying to back over her. A domestic assault at 2:15 in the morning when the child is somewhere at day care. Another instance where the mother and her sister… [were] involved in an altercation.
>
> All these instances continue to concern the Court. Although the child is not with her, sooner or later this type of violent behavior, the child is going to be with her.… [W]hen the child returned from summer vacation, the mother failed to call the child back after the child called her on her return and didn't get back to her for several days.
>
> On the other hand, the father is getting an education, lives in a stable household. Although he lives with Ms. McClure in an unmarried relationship, the testimony is that the relationship is stable. That her children are involved in several extracurricular activities including AAU sports and travel teams. The Court believes this is a good environment for the minor child.

The Court does believe that there's a significant change of circumstances… [and that] it's the child's best interest to … appoint [Father] as the primary custodian.

After concluding that a material change in circumstances had occurred and that it was in the child's best interest to designate Father the primary residential parent, the Juvenile Court set forth Mother's co-parenting schedule. Father's child support obligation ceased and the parties were instructed to determine Mother's child support obligation and to make an appropriate adjustment in light of this Court's opinion in *Casteel v. Casteel*, No. 03A01-9703-CV-00073, 1997 WL 414401 (Tenn. Ct. App. July 24, 1997), *perm. app. denied Mar. 2, 1998*. The parties later submitted a parenting plan to the Juvenile Court which, among other things, established Mother's monthly child support obligation at $141.48. The Juvenile Court then entered a final judgment setting forth its findings from the hearing and incorporating the terms of the parenting plan.

Mother appeals raising two issues, which we quote:

I.      The Trial Court erred in not following the mandate of Tenn. Code Ann.§ 36-6-404(b) in determining the custody of [the child].

II.     Child support should be set according to the orders of the Trial Court, which included a *Casteel* adjustment which was not credited to [Mother].

**Discussion**

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address Mother's claim that the Juvenile Court erred by not following "the mandate of Tenn. Code Ann. § 36-6-404(b) in determining *the custody* of [the child]." (emphasis added). Tenn. Code Ann.§ 36-6-404(b) lists sixteen factors which must be considered by a trial court when implementing a parenting plan. More specifically, the portion of the statute immediately preceding the sixteen factors states:

Any permanent parenting plan shall include a residential schedule as defined in § 36-6-402(3). The court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic

circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the following factors ….[2]

The most glaring problem with Mother's first issue is her argument that the Juvenile Court erred by not detailing its findings with regard to each of the sixteen factors when arriving at its "custody" decision. The statute's plain language is such that these factors are to be considered when developing a parenting plan, as opposed to making a custody determination. Except for the amount of her monthly child support obligation, Mother does not argue that her co-parenting time or any other aspect of the parenting plan is in error if Father was properly designated the primary residential parent.

As noted previously, once the parties' child was born Mother had custody because there was no order of custody to the contrary designating Father or anyone else as the primary residential parent. *See* Tenn. Code Ann. § 36-2-303. What is unclear from the record, however, is whether an order of custody designating Mother as the primary residential parent was entered sometime after the child was born. We know that Father was ordered to pay child support in 2003, but that order is not in the record which prevents our being able to determine whether that order fairly can be characterized as an "order of custody." If there was no initial order of custody, then Father needed only to prove that designating him as the primary residential parent was in the child's best interest applying the comparative fitness test, and he was not required first to prove that there also had been a material change in circumstances. *See Williams v. Barnes-Mason*, No. E2002-01442-COA-R3-CV, 2003 WL 2010755 (Tenn. Ct. App. Apr. 30, 2003), *no appl. perm. appeal filed*, where we concluded:

> Tenn. Code Ann. § 36-2-303 provides that the custody of a child born out of wedlock shall be with the mother unless there is an Order otherwise. This Court has held that if a custody dispute arises between parents over a child born out of wedlock the comparative fitness test is the proper standard to be applied, where there has been no previous custody decree.

*Williams*, 2003 WL 2010755, at *2 (citing *Durant v. Howard*, No. E2000-02072-COA-R3-CV, 2001 WL 1103500 (Tenn. Ct. App. Sept. 20, 2001), *no appl. perm. appeal filed*).[3]

---

[2] Tenn. Code Ann. § 36-6-406 sets forth when restrictions on co-parenting time in a temporary or permanent parenting plan are appropriate based on specified conduct of a parent, such as when a parent abuses a child, etc.

[3] We note that in *In re B.A.L. and A.E.L*, No. W2004-00826-COA-R3-JV, 2004 WL 3008810 (Tenn. Ct. App. Dec. 23, 2004), *no appl. perm appeal filed*, the Western Section of this Court seems to suggest that a mother's having custody by virtue of Tenn. Code Ann. § 36-2-303 is sufficient to require that a material change in circumstances first be

(continued...)

In short, the record does not contain an "order of custody," and in the absence of such an order Father was required only to establish by a preponderance of the evidence that designating him as the primary residential parent after applying the comparative fitness test was in the child's best interest. However, it is clear, for whatever reason, that the Juvenile Court and the parties proceeded on the assumption that Father was required to satisfy the more stringent material change in circumstances standard. It also is clear that if the Juvenile Court correctly concluded that Father met the more stringent standard, then whether or not the less stringent standard actually applied becomes moot. For this reason alone, we now examine whether the Juvenile Court correctly concluded that Father had proven the existence of a material change of circumstance and, if so, whether designating him as the primary residential parent was in the child's best interest.

According to our Supreme Court in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002):

> The "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. [*Blair v. Badenhope*, 77 S.W.3d 137] at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id*. (citations omitted).

*Kendrick*, 90 S.W.3d at 570. *See also* Tenn Code Ann. § 36-6-101(a)(2)(B)("If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child.…").

If a material change in circumstances has been proven, when undertaking a best interests analysis Tenn. Code Ann. § 36-6-106 (a) requires a trial court to consider the following:

> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

---

[3](...continued)
proven in any future change of custody proceedings.

(3)  The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4)  The stability of the family unit of the parents;

(5)  The mental and physical health of the parents;

(6)  The home, school and community record of the child;

(7) (A)The reasonable preference of the child if twelve (12) years of age or older;

(B)  The court may hear the preference of a younger child upon request.  The preferences of older children should normally be given greater weight than those of younger children;

(8)  Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, as defined in §39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred.  The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto.  In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9)  The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing

parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a).

Even if we give Mother the benefit of the doubt and proceed as if she argues that the Juvenile Court erred when it failed to detail its findings with regard to the factors set forth in Tenn. Code Ann. § 36-6-106(a), as opposed to Tenn. Code Ann. § 36-6-404(b), her argument still fails. Recently, in *Craig v. Craig*, No. E2003-02479-COA-R3-CV, 2004 WL 1906448 (Tenn. Ct. App. Aug. 26, 2004), *no appl. perm. appeal filed,* we rejected a similar argument. After noting that trial courts should be as detailed as possible, we nevertheless stated:

> Husband claims the Trial Court failed to compare the relative fitness of the parties since most of the relevant factors contained in Tenn. Code Ann. § 36- 6-106(a) favor Husband. In its memorandum opinion, the Trial Court did not list each of the applicable factors and explain how that particular factor impacted its overall decision. While this statute does require a trial court to consider all of the listed factors which are applicable, it does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination.

*Craig*, 2004 WL 1906448, at * 7 (footnotes omitted).

We again emphasize that a trial court should be as detailed as possible when rendering a decision in a custody case. Nevertheless, we believe the Juvenile Court's findings in the present case are sufficiently detailed for us to conclude that the evidence does not preponderate against the Juvenile Court's findings that there was a material change in circumstances and that designating Father as the primary residential parent was in the child's best interest.

The second issue surrounds the amount of Mother's monthly child support payment which was set at $141.48. We review child support decisions for abuse of discretion. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244 (Tenn. Ct. App. 2000). However, a trial court's discretion is limited because such "discretion must be exercised within the strictures of the Child Support Guidelines." *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *see also Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996).

The parties agree that the Juvenile Court determined Mother's child support should be based on the federal minimum wage since Mother was not working, and there should be a *Casteel* adjustment because Mother was exercising more than standard visitation. The parties further agree that Mother's annual child support obligation before any adjustment should be $1,992.00, which equals $166.00 per month or $5.46 per day. The disagreement arises from the amount of the

adjustment to be made for Mother's increased visitation. Father argues that Mother's annual co-parenting time is 146 days, while Mother argues her co-parenting time totals 150 days. While it is difficult to determine Mother's exact co-parenting time because the parties alternate various holidays each year, we believe Mother's claim that her co-parenting time totals 150 days is the most accurate. Mother's total co-parenting time of 150 days per year is 70 days more than the presumptive 80 days under the Guidelines. The amount of daily child support of $5.46 for these seventy days equals $382.20, which should be deducted from the total annual support of $1,992.00. This reduces Mother's child support obligation to $1609.80 annually, or $134.15 per month. Accordingly, we modify the Juvenile Court's judgment to reflect Mother's monthly child support obligation to be $134.15. As modified, the Juvenile Court's judgment is otherwise affirmed.

### Conclusion

The Judgment of the Juvenile Court is affirmed as modified and this cause is remanded to the Juvenile Court for collection of the costs below. Exercising our discretion, costs on appeal are assessed against the Appellant, Romina Jessica Clifton, and her surety.

_____
D. MICHAEL SWINEY, JUDGE